**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| RJM, a minor by his mother ) | |
| LaQuisha J. Moore, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | 1:07-cv-385-SEB-TAB |
| ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**ENTRY DISCUSSING COMPLAINT FOR JUDICIAL REVIEW**

RJM, a minor, by his mother LaQuisha Moore ("Moore"), seeks judicial review of the determination by the Commissioner of the Social Security Administration ("Commissioner") that he was not eligible for Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. § 301, *et seq.* (the "Act").

For the reasons explained in this Entry, the Commissioner's decision must be **remanded for further proceedings.**

**I. Background**

On March 20, 2003, Moore filed an application for child's SSI on behalf of her minor son. The application was denied initially and upon reconsideration. Her request for a hearing before an Administrative Law Judge ("ALJ") was granted, and such hearing was conducted on April 13, 2004. Moore and RJM were present, with their attorney. Medical and other records were introduced into evidence, and RJM and Moore testified. The ALJ issued a decision on May 21, 2004, denying benefits. The decision was appealed and the Appeals Council upheld the decision. On behalf of her son, Moore filed a civil action in this court and on January 13, 2006, in *RJM v. Barnhart*, 1:04-cv-1623-JDT-TAB, the action was remanded for further consideration.

A second hearing was conducted on May 12, 2006. Moore and RJM were present, with their attorney. Medical and other records were introduced into evidence, and RJM and Moore testified. The ALJ issued a decision on June 20, 2006, again denying benefits. The ALJ's decision became the final administrative decision on February 21, 2007, when the Appeals Council denied Moore's request for review, *see Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir. 1994), and this action for judicial review followed. The court has jurisdiction over the complaint pursuant to 42 U.S.C. § 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such

decision by a civil action . . . in [a] district court of the United States."

The ALJ's decision included the following findings: (1) RJM was born on August 14, 1993, was a school-age child on March 20, 2003, the date the application was filed, and was an adolescent at the time of the ALJ's decision; (2) RJM had not engaged in substantial gainful work activity at any time relevant to the ALJ's decision; (3) RJM had the following severe impairments: attention deficit/hyperactivity disorder and depressive disorder; (4) RJM did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (5) RJM did not have an impairment or combination of impairments that functionally equaled the listings. With these findings in hand, and through the application of applicable rules, the ALJ concluded that RJM had not been "disabled" as defined in the Act since March 20, 2003, the date the application was filed.

## II.  Discussion

### A.  Applicable Law

An individual under the age of 18 shall be considered disabled for purposes of SSI if that individual has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

To be found disabled, a child must show that (1) he is not engaged in performing substantial gainful activity; (2) he has a medically determinable impairment that is severe; and (3) his impairments meet, medically equal, or functionally equal the listings. 20 C.F.R. § 416.924(b), (c), (d). At step three of the evaluation process, if a child's impairments do not meet or medically equal any listing, the ALJ will determine whether the child's impairments functionally equal the listings. 20 C. F. R. § 416.926a. In doing so, an ALJ considers how a child functions in six domains:

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;
(iv) Moving about and manipulating objects;
(v) Caring for himself; and,
(vi) Health and physical well-being.

20 C. F. R. § 416.926a(b).

To functionally equal a listing, a claimant must have "marked" limitations in two of the above domains or an "extreme" limitation in one domain.[1]

---

[1] The regulations provide that a claimant has "a 'marked' limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits

2

The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993).  "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

### B.    Analysis

RJM argues that the ALJ erred in several respects in his step three determinations. RJM contends that substantial evidence does not support the ALJ's step three findings and that the ALJ's credibility determination was patently wrong.[2]

#### 1.    Listings

The ALJ determined that RJM's most consistent diagnoses were attention deficit/ hyperactivity disorder ("ADHD") and a depressive disorder. (R. at 363). Accordingly, he discussed Listing 112.04 (mood disorders, including depression) and Listing 112.11 (ADHD). The requirements for each listing are recited in the Appendix to this Entry. The ALJ concluded that RJM had no marked limitations and therefore did not meet, medically equal or functionally equal any listing. (R. at 365-66).[3]

---

only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Marked' limitation also means a limitation that is 'more than moderate but 'less than extreme.' It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C. F. R. § 416.926a(e).

[2] RLJ's claim that the ALJ's decision violated his due process rights is not supported by any examples of extreme conduct or bias which rise to the level of fundamental unfairness and, therefore, will not be discussed any further. *See Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007).

[3] RJM also argues that the ALJ erred in not discussing Listings 112.02 (organic mental disorder), 112.03 (schizophrenia), and 112.08 (personality disorder). In support of this argument as to Listing 112.02, RJM cites a single notation in a June 2001 psychiatric evaluation stating "R/O (rule out) organic brain damage." (R. at 241). RJM cites to no evidence that RJM was diagnosed with organic brain damage. Moreover, RJM cites to no evidence of any diagnoses of schizophrenia or personality disorder. In relation to Listing 112.03, he refers to a single notation that a medication Risperdal was prescribed, (R. at 437), which he alleges is prescribed to treat schizophrenia. This is not supported by any evidence of record. Indeed, the medical note cited indicates that Risperdal was actually prescribed for "depression." *Id.*  RJM has similarly failed to present evidence establishing that his impairments met or equaled Listing 112.08. The ALJ was not required to discuss listings for which no evidence existed, and, therefore, this contention of error has no merit.

3

RJM asserts that at step three the ALJ erroneously imposed a stricter standard than that imposed by the regulations. The ALJ stated that RJM's depression had satisfied the "A" criteria of Listing 12.04, but that he had not had "marked" impairments in the "B" criteria "for twelve continuous months." ("marked impairment in age-appropriate cognitive communicative function, social functioning or personal functioning, or marked difficulty in maintaining concentration, persistence or pace"). (R. at 357). The ALJ similarly held that with regard to Listing 112.11, the medical evidence did not document the required "characteristics for twelve continuous months at a marked level." *Id.* RJM correctly asserts that to hold RJM to a showing that his symptoms were manifested at a marked level for twelve continuous months is improper.

By definition, a claimant's *impairment* must last or be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i). As acknowledged by the Commissioner, this is the duration requirement of the disability statute. *See* 20 C.F.R. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."). The severity provisions, on the other hand, allow for persistent but "either continuous or intermittent" symptoms. *See* Listing 112.04A; *McGee v. Bowen,* 647 F.Supp. 1238, 1251 (N.D. Ill. 1986) ("A showing of continuous psychotic symptoms for twelve consecutive months has never been a requirement for a finding of disability by reason of mental impairment."). *See also Pagan v. Bowen*, 862 F.2d. 340, 348 (D.C. Cir. 1988) ("Every court to consider the issue has held that the Secretary cannot attach a 12-month durational requirement to individual episodes of psychotic behavior."). It is undisputed that RJM's impairments of ADHD and depressive disorder continued for more than twelve months.

The court cannot determine with any specificity, however, how this error effected the ALJ's evaluation of the evidence, although this error may very well be outcome determinative. Indeed, the ALJ stated that RJM "may well have met a listing from March 13, 2003, when he decompensated for a relatively brief time. However, his medical records document significant improvement within twelve months." (R. at 363). In March 2003, RJM had run away from school and attempted suicide. (R. at 358). There was little to no evidence of RJM being suicidal after his discharge from the hospital, and to that extent there was improvement. The ALJ's own decision, however, acknowledges that RJM received mental health treatment in April 2004 to address depression and problems sleeping. (R. at 360). This was a year after his discharge from the hospital. The ALJ noted that in April 2004 RJM had ADHD, poor anger control and oppositional/defiant behavior. *Id.* RJM's depression was reportedly worsening in May 2004 and he was described as disruptive in December 2004. *Id.* Although after therapy and treatment the record does demonstrate some improvement of his symptoms during that three year period by the time his therapy sessions ended in January 2006, whether the symptoms were sufficiently severe to meet, medically equal or functionally equal a listing, even perhaps for a closed period of time, whether continuously or intermittently, is the dispositive issue. On remand, the ALJ shall demonstrate that his evaluation of the evidence properly distinguishes between the duration and severity requirements.

RJM also contends that the ALJ did not adequately consider the evidence of record that supported RJM's claim. RJM points to various instances where the ALJ omitted from

4

his discussion portions of or entire records which would detract from his conclusion that RJM's symptoms had significantly improved at certain points in time.

The ALJ did not discuss psychiatric therapy notes from June 26, 2004, reflecting that RJM had exhibited aggressive, assaultive behavior, hitting his siblings and leaving knots on their heads. (R. at 410). Although the ALJ noted the December 4, 2004, psychiatric note stating that RJM was "disruptive," that same note also stated that RJM had a "very poor attitude," was not following his mother's directions, griped about everything, snapped at people, exhibited depressive and disruptive behavior, did not pay attention at school, and had been suspended for two days at school. (R. at 360, 417).

The ALJ did not discuss the April 21, 2005, progress note that RJM reported that "he felt normal and denied problems at home or school," but was "unable to identify positive events over the past week." (R. at 441). The therapist reported that RJM had depressed mood and limited insight and judgment. *Id.* The ALJ mentioned the April 24, 2005, therapy note stating that RJM had begun taking five medications, but failed to discuss the fact that RJM had not taken his medications for one to two months and that one of the medications made his stomach hurt. (R. at 361, 443). That note also indicated that RJM felt anger at school and had sadness, and he was not doing his homework. (R. at 443). The ALJ did not discuss notes from April 25, 2005, through May 5, 2005, which indicated RJM's failure to stay involved with group therapy, his not wanting to participate in group therapy, his need to be redirected, and a teacher's report that RJM had been suspended for running in and out of class and being disruptive. (R. at 451-459).

The ALJ stated that RJM had "improved by September 19, 2005," and that a September 26, 2005, treatment note reflected such improvement. (R. at 361, citing R. at 495). The September 19 records, however, indicated that RJM was struggling daily with impulsive behavior and that he needed to work on the area of personal aggression. (R. at 489-90). Moreover, the September 26 record indicated that RJM had problems staying focused and had to be redirected on several key components. (R. at 495).

The ALJ did not mention the September 22, 2005, therapist note which indicated that RJM's mid-term grades were 4 F's and 1 D and that RJM had laughed, "acting" surprised, demonstrating inappropriate affect and his defense mechanism of making jokes. (R. at 492). The ALJ did not mention the September 22, 2005, note that RJM struggled with ADHD symptoms, his parents had discontinued his medications, and sitting away from students or by the teacher did not help him avoid distractions. (R. at 493). A September 30, 2005, mental health note, not mentioned by the ALJ, indicated that RJM's father reported that RJM's behavior was "worsening," he got into trouble for lying, and he was manipulative. (R. at 500).

Although the ALJ acknowledged October 11 and 12 reports that RJM's participation in group therapy was exceptional, the ALJ did not address the notation that RJM still had problems with overall behavior consistency and needed to be more positive in the classroom. (R. at 362, 506-07). The ALJ also failed to discuss the October 7, 2005, treatment plan review which indicated that RJM still had some depressive symptoms, he still had self-control issues, his grades were low and his behavior had been "terrible." (R. at 505). His diagnoses had not changed. *Id.*

The ALJ mentioned a December 15, 2005, report concerning his divorced parents fighting about money, but the ALJ did not mention another December 15 report concerning RJM being constantly redirected by a teacher in the hallway. (R. at 541). The ALJ acknowledged that RJM had been disciplined in school 11 times during a three month period (January 26, 2006, through April 21, 2006) for fighting, disruptive behavior and name calling. (R. at 363, 419-20). This behavior occurred after RJM had been discharged from treatment. The ALJ did not explain how this degree of disruption and misbehavior constituted "improvement" nor how it was considered in relation to the "interacting and relating with others" domain. (R. at 419-20).

The ALJ also concluded that "[s]chool records also indicate that the claimant had no marked limitations after his discharge from hospital." (R. at 363). RJM was discharged from the hospital on March 17, 2003. (R. at 358). The ALJ failed to articulate how the consistent reports of disruptive behavior, poor anger and impulse control, numerous disciplinary sanctions, and failing grades during the years of 2003 through 2006 "indicate that the claimant had no marked limitations." For example, in January 2006, RJM's seventh grade grades were 4 F's (reading, math, science, and language arts) and 2 D's. (R. at 434). Three teachers commented that RJM "needs to complete assignments" and one teacher also noted RJM "displayed disruptive behavior." (R. at 433). The ALJ did not explain how the reports that RJM failed to complete or turn in a large portion of his school work, received low to failing grades, was easily distracted and had limited concentration were considered in relation to the domains "acquiring and using information" and "attending and completing tasks." As discussed above, the ALJ's conclusions that RJM experienced significant improvement within a relatively short period of time and had no marked limitations are not supported by the evidence discussed by the ALJ. This is even more the case when considering the omitted evidence favorable to RJM.

Although the ALJ need not discuss every piece of evidence, he may not "select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In this case the ALJ selected portions of the record to conclude that RJM's symptoms were not as severe as the complete record indicates. The court "require[s] an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies." *Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007). The ALJ did not provide such an explanation.

As set forth at length in this Entry, the ALJ ignored a portion of the evidence that was favorable to RJM, and his reasoning with respect to some of the evidence he did discuss cannot be traced to his conclusion. Under these circumstances, the court cannot be confident that the ALJ considered the important evidence of record, nor can it trace the path of the ALJ's reasoning because a significant portion of that reasoning is absent. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Hickman v. Apfel,* 187 F.3d 683, 689 (7th Cir. 1999) (an ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of [his] reasoning.") (internal quotation omitted). Intertwined with this deficiency is the fact that the ALJ reviewed the evidence using an improper, stricter standard that RJM must show that his symptoms were continuously manifested at a marked level of severity.

RJM also argues that an ALJ cannot accept the opinion of a non-examining physician, by itself, as a basis to reject the opinion of an examining physician. He relies on *Gudgel v. Apfel*, 345 F.3d 467, 470 (7th Cir. 2003) for this proposition. More recently, however, without citing *Gudgel*, the Seventh Circuit discussed the "treating physician rule" in *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). In that case, like here, the plaintiff argued that it was erroneous for the ALJ to refuse to give controlling weight to treating physician opinions when they were inconsistent with evidence from physicians who had not treated or even examined the claimant. *Id.* at 376. The court rejected this argument, holding that if well-supported evidence is introduced which contradicts the opinion of a treating physician, even if it is that of non-treating, non-examining physicians, then the treating physician evidence is not controlling and it is just one more piece of evidence to consider. *Id.* at 377. These two cases are at odds and have not been directly reconciled. In addition, the Seventh Circuit has cited the *Gudgel* proposition in unpublished cases since the *Hofslien* decision was issued. *See Oakes v. Astrue*, 2007 WL 4455436 at *7 (7th Cir. Dec. 20, 2007) ("a contradictory opinion of a non-examining physician does not, by itself, suffice to provide the evidence necessary to reject a treating physician's opinion"); *Taylor v. Barnhart*, 189 Fed.Appx. 557, 562 (7th Cir. 2006) (same). Although the Seventh Circuit stated that "[i]t is time that the Social Security Administration reexamined the rule," *Hofslien*, 345 F.3d at 376, the codified "treating physician" rule continues to direct that more weight generally be given to well-supported treating and examining sources than to non-examining sources and that supportability, consistency, and areas of speciality be considered as well. 20 C.F.R. § 416.927(d).

Treating psychiatrist Dr. Mishra opined in March 2004 that RJM had marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating to others. (R. at 360, 216). The ALJ acknowledged the report and discussed the reasons he rejected it. (R. at 360). The ALJ did not give Dr. Mishra's opinion significant weight because it lacked explanations for its conclusions and was not consistent with school reports and the opinions of the State Agency physicians. *Id.*

Although the form completed by Dr. Mishra did not specify the basis for the psychiatrist's opinion, the attached records from the Indiana Health Group ("IHG"), and prior records from IHG, where RJM was treated by Dr. Sanders and Dr. Mishra, support such findings. (R. at 108-126, 210-217) (discussing various incidents and the need to decrease depression, improve school behavior, improve anger control, and improve conflict with mother, father, mother's boyfriend, and siblings). Dr. Mishra's opinion was not delivered in a vacuum. Because the ALJ did not highlight much of the evidence that favored a finding of marked symptoms, a large part of the basis for rejecting the opinion of Dr. Mishra (as inconsistent with school records, clinical data and other evidence) is not supported by substantial evidence. Although not automatically entitled to controlling weight, the reasons given by the ALJ for not giving Dr. Mishra's opinion significant weight cannot be traced from the evidence and will need to be reconsidered on remand.

### 2. Medical Expert

RJM argues that the ALJ was required to summon a medical expert to help determine whether his impairments medically equaled a listed impairment. RJM relies on *Barnett v. Barnhart*, 381 F.3d 664, 670-71 (7th Cir. 2004) to support his contention that an

7

ALJ must consider a consulting physician's opinion regarding medical equivalence. In this case, however, unlike in *Barnett*, medical experts did render an opinion as to medical equivalency. (R. at 102, 136). Two State Agency Ph.D. experts opined that RJM's impairments were severe but did not meet, medically equal or functionally equal the listings. *Id.* These opinions satisfied the ALJ's duty to consider an expert's opinion on medical equivalence. Consistent with the discussion in Part II. B. 1. of this Entry, this does not mean, however, that such opinions provide substantial evidence in light of the conflicting evidence consisting of subsequent school records and reports from treating mental health professionals and teachers. On remand, the weight of these non-examining sources will have to be reconsidered.

### 3. Credibility

RJM further argues that the ALJ's credibility determination is patently erroneous because it is contrary to Social Security Ruling ("SSR") 96-7p. He asserts that the ALJ failed to discuss the seven criteria in the regulation. The Commissioner has not responded to this claim of error.

The ALJ found that neither RJM nor his mother were credible witnesses. In determining RJM's credibility, the ALJ recited the appropriate regulations, but did not discuss the various criteria contained in those regulations. (R. at 365, citing 20 C.F.R. § 416.929 and SSR 96-7p.). Although pain is not the symptom at issue in this case, RJM's symptoms including depression, inattentiveness, anger, and disruptive behavior could nonetheless be reviewed pursuant to the applicable criteria: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR96-7p. On remand, the ALJ shall reconsider the credibility of RJM and his mother.

The ALJ stated that with respect to RJM's mental status, the treatment records showed "steady improvement until he was discharged from treatment on January 27, 2006." (R. at 365). Although certainly there was some improvement of RJM's symptoms between March 2003 and January 2006, this was not immediate and it came only after many daily sessions of group and individual therapy during which poor behavior, lack of attention, and depressive and disruptive symptoms were addressed. On remand, the Commissioner shall consider whether based on the record as it exists and based on the errors discussed in this Entry, RJM is eligible for a closed period of eligibility (from March 20, 2003, through January 27, 2006).

8

### III. Conclusion

For the reasons discussed in this Entry, the ALJ's conclusions at step three of the sequential analysis are not supported by substantial evidence and the court is required to **remand** the case to the ALJ for further consideration. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991) (a court may remand the case after passing on its merits and issuing a judgment affirming, modifying, or reversing the Commissioner's decision, a "sentence four" remand).

Given the lengthy history of this case, the court urges the Commissioner to expedite any further proceedings required to resolve this case. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 03/27/2008

*[signature: Sarah Evans Barker]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana